Slip-Op. No. 13-40

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
|
JINXIANG CHENGDA IMPORT &    :
EXPORT CO., LTD.,            :
|
Plaintiff,       :
|
v.          :
|
UNITED STATES,              :        Before: Richard K. Eaton, Judge
|
Defendant,       :        Court No. 11-00144
|
and         :        **Public Version**
|
FRESH GARLIC PRODUCERS      :
ASSOCIATION, CHRISTOPHER     :
RANCH, L.L.C., THE GARLIC    :
COMPANY, VALLEY GARLIC, and  :
VESSEY AND COMPANY, INC.     :
|
Defendant-Intervenors.  :
_____|

OPINION

[Plaintiff's motion for judgment on the agency record is denied and the Department of Commerce's final determination rescinding plaintiff's new shipper review is sustained.]

Dated: March 25, 2013

*John J. Kenkel*, deKieffer & Horgan, of Washington, D.C., argued for plaintiff. With him on the brief were *Gregory S. Menegaz* and *J. Kevin Horgan*.

*Melissa M. Devine*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, D.C., argued for defendant. With her on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director. Of counsel on the brief was *George H. Kivork*, Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, D.C.

*John M. Herrmann*, Kelley Drye & Warren, LLP, of Washington, D.C., argued for defendant-intervenors. With him on the brief was *Michael J. Coursey*.

Eaton, Judge:  This matter is before the court on plaintiff Jinxiang Chengda Import & Export Co., Ltd.'s ("plaintiff" or "Chengda") motion for judgment on the agency record pursuant to USCIT Rule 56.2.  *See* Pl.'s Br. in Supp. of Mot. J. Agency R. ("Pl.'s Br.") (ECF Dkt. No. 27).  Defendant, the United States, and defendant-intervenors, the Fresh Garlic Producers Association, Christopher Ranch LLC, The Garlic Company, Valley Garlic, and Vessey and Company, Inc. (collectively, "defendant-intervenors"), oppose the motion.  *See* Def.'s Mem. in Opp. to Pl.'s Mot. J. Agency R. ("Def.'s Mem.") (ECF Dkt. No. 46); Def.-Ints.' Br. in Resp. to Pl.'s Mot. J. Agency R. ("Def.-Ints.' Br.") (ECF Dkt. No. 49).

Chengda, an exporter of peeled garlic from the People's Republic of China ("PRC"), challenges the United States Department of Commerce's ("Commerce" or the "Department") rescission of its new shipper review for fresh garlic from the PRC for the period of review ("POR") November 1, 2008 through October 31, 2009.  *See* Garlic from the PRC, 76 Fed. Reg. 19,322 (Dep't of Commerce Apr. 7, 2011) (rescission of antidumping duty new shipper reviews) ("Rescission"), and the accompanying Final Bona Fides Memorandum (Dep't of Commerce Mar. 31, 2011) ("Bona Fides Mem.").  Specifically, plaintiff argues that Commerce erred in rejecting Chengda's U.S. sale as non-bona fide.  The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006).

For the reasons set forth below, plaintiff's motion is denied and defendant's Rescission of Chengda's new shipper review is sustained.

## BACKGROUND

In 1994, Commerce issued an antidumping duty order on imports of fresh garlic from the PRC.  Fresh Garlic from the PRC, 59 Fed. Reg. 59,209 (Dep't of Commerce Nov. 16, 1994) (antidumping duty order).  Chengda is a new exporter that did not participate in the underlying

antidumping investigation or in any prior administrative review.  Therefore, the company is

subject to the PRC-wide antidumping rate unless it can secure an individual rate through a new

shipper review.

On November 25, 2009, Commerce received Chengda's timely request for a new shipper

review.  *See* Fresh Garlic from the PRC (Dep't of Commerce Nov. 25, 2009) (request for new

shipper review) (P.R. 1; C.R. 1).  On January 5, 2010, the Department initiated the new shipper

reviews for three exporters of fresh garlic from the PRC, including Chengda.  *See* Fresh Garlic

from the PRC, 75 Fed. Reg. 343 (Dep't of Commerce Jan. 5, 2010) (initiation of new shipper

reviews).  On April 7, 2011, the contested Rescission of Chengda's new shipper review was

published after the Department concluded that Chengda's sales were not commercially

reasonable, and therefore not bona fide.  Rescission, 76 Fed. Reg. at 19,324.

## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19

U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.   Legal Framework

Under 19 U.S.C. § 1675(a)(2)(B), Commerce shall, upon request, conduct administrative

reviews "for new exporters and producers."  19 U.S.C. § 1675(a)(2)(B).  The purpose of these

new shipper reviews is to determine whether exporters or producers, whose sales have not been

previously examined, are (1) entitled to their own duty rates under an antidumping order, and (2)

if so, to calculate those rates.  *See Hebei New Donghua Amino Acid Co. v. United States*, 29 CIT

603, 604, 374 F. Supp. 2d 1333, 1335 (2005).  When conducting these new shipper reviews, "[i]t

is Commerce's practice . . . to determine whether the new exporters and producers have

conducted bona fide or commercially reasonable transactions."  *Shandong Chenhe Int'l Trading*

*Co. v. United States*, 34 CIT __, __, Slip Op. 10-129, at 5 (Nov. 22, 2010) (citing 19 C.F.R. §

351.214(b)(2) (2009); *Hebei New Donghua*, 29 CIT at 608, 374 F. Supp. 2d at 1338).  In doing

so, "Commerce normally employs a totality of the circumstances test to determine whether the

transaction is 'commercially reasonable' or 'atypical of normal business practices.'"  *Shandong*

*Chenhe*, 34 CIT at __, Slip Op. 10-129, at 6 (quoting *Hebei New Donghua*, 29 CIT at 610, 374 F.

Supp. 2d at 1339).  Thus, if Commerce determines, after reviewing all of the circumstances

surrounding a sale, that the sale was not commercially reasonable, and thus not bona fide, it may

rescind the new shipper review.

        "In evaluating whether or not a sale is 'commercially reasonable,' Commerce has

considered the following factors, among others: (1) the timing of the sale, (2) the price and

quantity[,] (3) the expenses arising from the transaction, (4) whether the goods were resold at a

profit, (5) and whether the transaction was at an arm's length basis."  *Hebei New Donghua*, 29

CIT at 610, 374 F. Supp. 2d at 1339 (citations omitted); *see also Allied Tube & Conduit Corp. v.*

*United States*, 31 CIT 1090, 1092 (2007).  When weighing these factors, Commerce's

overarching goal is to determine "whether the sale(s) under review are indicative of future

commercial behavior."  *Hebei New Donghua*, 29 CIT at 613, 374 F. Supp. 2d at 1342 (citations

omitted); *see also Shandong Chenhe*, 34 CIT at __, Slip Op. 10-129, at 6; *Tianjin Tiancheng*

*Pharm. Co. v. United States*, 29 CIT 256, 258, 366 F. Supp. 2d 1246, 1249 (2005).  For

Commerce, a primary indication that a sale (or series of sales) is not bona fide is evidence that

the sales price is unusually high in comparison to the prices of other sales of subject merchandise

during the POR.  Underlying this sales price inquiry is the idea that a respondent might arrange

for a high sales price in order to avoid the imposition of a significant antidumping duty margin.[1]

## II.     Commerce's Rescission of Chengda's New Shipper Review Was Supported by Substantial Evidence

### A.   Chengda's Sales Prices Were Unusually High

Chengda's transaction was structured so that the company first sold its garlic to an

affiliated U.S. importer and then the affiliate made three sales to unaffiliated U.S. retailers.  The

Department's first step in its consideration of Chengda's sales prices was to determine (1) the

price at which Chengda sold its garlic to the affiliated U.S. importer (the internal "transfer

price"[2]) and (2) the price at which the affiliated U.S. importer resold the garlic to the three

unaffiliated retail stores (the "constructed export price" or "CEP"[3]).  Commerce then compared

---

[1]        An antidumping duty margin is "the amount by which the normal price exceeds the export price or constructed export price of the subject merchandise."  19 U.S.C. § 1677(35)(A).  In other words, "[i]f the price of an item in the home market (normal value) is higher than the price for the same item in the United States (export price), the dumping margin comparison produces a positive number, indicating that dumping has occurred."  *Qingdao Sea-Line Trading Co., Ltd. v. United States*, 36 CIT __, __, Slip Op. 12-00036, at 5 n.3. (Mar. 21, 2012).  Therefore, if a respondent is able to enter its merchandise at a high sales price, the difference between the sales price and the price in the home market will be low, resulting in a low dumping margin.

[2]        "Transfer price" refers to the price at which the subject merchandise is first sold by the producer or exporter to an affiliated importer.  *See Huvis Corp. v. United States*, 32 CIT 845, 845 (2008).

[3]        Under 19 U.S.C. § 1677a(a), "[t]he term 'export price' means the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted."  A "constructed export price" as defined by 19 U.S.C. § 1677a(b), is "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted."

these prices to the entered values of other PRC exporters' peeled garlic during the POR, as listed

in data from United States Customs and Border Protection ("Customs").  After making these

comparisons, Commerce determined that Chengda's sales prices were unusually high and did not

represent normal commercial practices.[4]  Def.'s Mem. 19 (citing Bona Fides Mem. at 4).

Chengda argues that Commerce's benchmark price comparison was not based on

substantial evidence, and challenges the Department's price analysis on several grounds.

*1.   Compliance With the Average Unit Value from the Customs Data*

Commerce began its analysis by comparing Chengda's internal transfer price to the AUV

in the Customs' data in order to determine whether the price appeared atypical when compared

to sales of similar merchandise.  Because the AUV was derived from a large sample of market-

determined sales prices for peeled garlic entered under the same tariff heading as plaintiff's

merchandise, Commerce found the comparison to be a valuable tool.  That is, the extent to which

Chengda's sales price exceeded the AUV would be evidence of a non-bona fide sale, and the

greater the variance, the more probative the evidence would be.

Plaintiff first argues that it is unreasonable to require Chengda to comply with an AUV

that it could not have known until after the POR.  Pl.'s Br. 17.  In other words, plaintiff's

position is that it was not reasonable for Commerce to require it to match the AUV in the

Customs data in order to be considered commercially reasonable, particularly since the AUV did

not become known until after the completion of the review.  Pl.'s Br. 17–18.

Defendant responds that the "confidentiality of the [Customs] data is not relevant to

Commerce's determination of whether Chengda's sale is commercially reasonable and indicative

_____

    [4]         Specifically, Commerce found that Chengda's CEP sales price of [[       ]], as
well as its internal transfer sales price of [[       ]], appeared unusually high when compared to
the AUV from the Customs data of [[       ]] for peeled garlic.  Def.'s Mem. 19.

of its future pricing." Def.'s Mem. 21.  Put another way, the Department argues that Chengda

was not disadvantaged by a lack of access to the AUV in the Customs data at the time it sold its

product for entry into the United States because the confidential data should have no bearing on

the determination by Chengda of its sales prices.

    Having considered this argument, the court agrees with Commerce and finds

unpersuasive Chengda's objection to the use of the Customs data because the AUV was not

known to the company until after the POR.  Plaintiff apparently believes that it should have

known, in advance, the value to which its sales price would be compared so that it might tailor its

price to the average of these bona fide sales.  This kind of tailoring, however, would defeat the

purpose of a new shipper review.  Commerce is charged with conducting new shipper reviews in

order to establish an antidumping duty rate based on a commercially reasonable, and hence

market-determined, sales price.  A sales price determined by reference to what others are

charging, rather than to what a willing seller and a willing buyer agree to, is not a market price.

Importantly, a price designed to approximate Commerce's reference point would provide the

Department with no information as to an importer's future behavior when not under review.

    *2.   Claimed Errors in the Customs Data*

    Next, plaintiff argues that the Customs data for peeled garlic contains "prima facie

errors" because it lists prices for peeled garlic that are the same as, or lower than, the prices for

whole garlic during the POR.[5]  Pl.'s Br. 19–20.  Plaintiff asserts that it is well-known in the

industry that peeled garlic is priced higher than whole garlic because it requires additional

processing.  Although plaintiff fails to point to any record evidence demonstrating that peeled

---

[5]       The Customs dataset for peeled garlic contains prices ranging from [[
]], while the dataset for whole garlic contains prices ranging from [[                       ]].
Bona Fides Mem. at 11.

garlic sells for more than whole garlic, or how much more, it nonetheless states that "Commerce has at least 15 years of data collected in administrative reviews showing that the cost to grow and process [peeled] garlic is routinely 20–40 times higher."  Pl.'s Br. 20.  Thus, plaintiff argues that, because the Customs datasets contain peeled garlic prices that are lower than whole garlic prices, it is beyond dispute that the Customs data is inaccurate.  Pl.'s Br. 20.

Defendant, however, has adequately demonstrated that plaintiff's contention that the Customs data contains "prima facie errors" is without merit.  As Commerce points out, if the highest sales price for whole garlic is excluded, which was for a sale of whole garlic the Department found to be non-bona fide, the difference between the whole and peeled garlic datasets no longer exists.[6]  Def.'s Mem. 22 (citing Bona Fides Mem. at 11).  In fact, the Customs data as a whole actually does reflect the higher price that plaintiff insists peeled garlic commands in the market.  Def.'s Mem. 22.  Furthermore, Commerce notes that when it excluded the high price for whole garlic that it found to be non-bona fide, "Chengda's transfer price . . . is actually the highest under *either* the whole or peeled garlic category," and its CEP sales price is even higher, thereby making the difference in prices between the two categories irrelevant.  Def.'s Mem. 22 (citing Bona Fides Mem. at 11).

This court has previously upheld Commerce's use of the AUV contained in Customs data as a point of comparison in new shipper reviews.  *See, e.g., Shandong Chenhe*, 34 CIT at __, Slip Op. 10-129, at 17; *Hebei New Donghua*, 29 CIT at 612, 374 F. Supp. 2d at 1342; *Tianjin Tiancheng*, 29 CIT at 267, 366 F. Supp. 2d at 1256.  While Chengda claims that the Customs

---

[6]        While the highest prices in the Customs data for whole and peeled garlic were [[ ]] and [[            ]] respectively, the latter being Chengda's price, Commerce explained that "excluding the [[      ]] sale of another new shipper Commerce found non-*bona fide* in this period of review, Chengda's transfer price of [[     ]] is actually the highest under *either* the whole or peeled garlic category."  Def.'s Mem. 22 (citing Bona Fides Mem. at 11).

data is inaccurate in light of the claimed low prices for peeled garlic, the company has failed to

provide any evidence, beyond mere speculation, that the Customs data is not representative.

Indeed, as indicated, the dataset contained only one value for whole garlic that was greater than

those for peeled garlic and the Department concluded that this value was the product of a non-

bona fide sale.  If this sale is disregarded, the prices for peeled garlic are higher than those for

whole garlic, and Chengda's is the highest of all.  Thus, Commerce has demonstrated that

plaintiff's claims of prima facie errors in the Customs datasets are unconvincing.

### 3.   *Comparison to a Single Data Point As Opposed to a Range of Values*

Plaintiff next contends that, assuming the Customs data is accurate, Commerce should

have compared Chengda's transfer price to the range of prices contained in the Customs data,

and not to the AUV.  Pl.'s Br. 21.  According to plaintiff, "[i]f the appropriate standard were

literally the single [AUV] of the collective [Customs] data, as Commerce claims, then 100

percent of the entries in the [Customs] database would not be bona fide, since they are either

above or below that AUV."  Pl.'s Br. 22 (emphasis omitted).  Put another way, plaintiff argues

that, if its transfer sale is aberrational because it does not match the AUV, then so too are all of

the sales values found in the Customs data because they are all either higher or lower than the

AUV.  For plaintiff, since no bona fide entry in the Customs data matches the AUV precisely,

the appropriate comparison is not to compare Chengda's transfer price to the AUV, but, rather, to

compare it to the range of prices contained in the Customs data.  Plaintiff argues that if

Commerce had done this type of comparison, it would have found that Chengda's transfer price

was not aberrational because it would have fallen within the range.

The AUV from the Customs' import data can be a useful tool for comparison because it

provides a fair representation of prices set by the market.  *See U.S. Steel Grp. v. United States*, 96

F.3d 1352, 1363 (Fed. Cir. 1996) ("Computing an average is arguably the most basic of all

statistical techniques.  It permits compression of large quantities of data into a single

representative figure capable of easy comprehension and assimilation.  In that respect, it is

undoubtedly a valuable tool."); *see also Shandong Chenhe*, 34 CIT at __, Slip Op. 10-129 at 17

("[U]sing the average of a large sample is a better indicator of normal activity than a comparison

of a smaller number of selected sales."); *Tianjin Tiancheng*, 29 CIT at 267, 366 F. Supp. 2d at

1256 ("[T]he larger the sample, the less risk run that the sample chosen is extreme or unusual

simply by chance.") (citing Laurence C. Hamilton, *Data Analysis for Social Scientists* 203

(Duxbury Press 1996)).

        While in some cases an examination of a range of prices may also be useful, Chengda's

criticism of Commerce's reliance on the AUV in the Customs data is unconvincing.  Here,

plaintiff argues for a comparison to the range of prices in order to show that Chengda's transfer

sales price was close to at least some similarly-priced entries of peeled garlic, although it was

much higher than the AUV.[7]  It is clear from the record evidence, however, that Chengda's

transfer price (and the CEP sales prices to the retailers for that matter) was not only high when

compared to the Customs AUV, but was also an outlier when compared to the range of values in

the Customs data.  Def.'s Mem. 23 ("Chengda's price was still *by far* the highest in the

[Customs] data for both peeled and whole garlic.").  Thus, the court finds that (1) because it

provides a fair point of comparison to measure commercial reasonableness for prices during the

POR, Commerce's AUV analysis was a useful tool for determining whether Chengda's sales

---

[7]        Chengda's internal transfer price of [[          ]], as well as its CEP sales price of [[
]], were both significantly higher than the AUV of [[          ]] for peeled garlic.  Chengda's
transfer price was not only the highest entered value in the Customs data, but it was dramatically
higher than the next highest priced entry.  Chengda's internal transfer price was in the [[        ]]
percentile and was nearly [[                                        ]] of the next highest-priced peeled garlic
entry.  Bona Fides Mem. at 4 n.18.

prices were aberrational, and (2) even had Commerce used the "range of values" analysis

plaintiff urges, the company's sales prices would have been found to be outside the norm.

### 4. *Analysis for Unique Products*

Plaintiff also argues that Commerce's reliance on the AUV deviates from its longstanding

practice when considering unique products.  Pl.'s Br. 10–14 (citing Certain Frozen Fish Fillets

from the Socialist Republic of Vietnam, 74 Fed. Reg. 11,349 (Dep't of Commerce Mar. 17,

2009) (final results of the antidumping duty administrative review and new shipper reviews)

("*Fish Fillets*"); Stainless Steel Sheet & Strip in Coils from Japan, 75 Fed. Reg. 6,631 (Dep't of

Commerce Feb. 10, 2010) (final results of antidumping duty administrative review) ("*Stainless

Steel*"); Wooden Bedroom Furniture from the PRC, 75 Fed. Reg. 9,581 (Mar. 3, 2010)

(preliminary results of antidumping duty new shipper review) ("*Furniture*")).  In those reviews,

according to plaintiff, Commerce found that the Customs data did not provide a useful

comparison because the products under review were unique, and thus not comparable to the

products represented by the Customs data, even though the unique products fell under the same

tariff heading as the other products in the data.  Plaintiff, however, does not provide any reason

why its garlic is unique enough to make a comparison with the Customs data for other entries of

peeled garlic inappropriate.

Based on this lack of evidence, defendant contends that plaintiff's product is not

sufficiently unique to benefit from the analysis in the reviews the company cites.  According to

Commerce, it properly distinguished the reviews cited by plaintiff (*Fish Fillets*, *Stainless Steel*,

and *Furniture*) from Chengda's case because "[i]n all three of the cases cited, [it] was faced with

complicated, unique products, or basket tariff categories that made matching the new shippers'

sales to the [Customs] data problematic."  Bona Fides Mem. at 9.  For example, in *Stainless*

*Steel*, Commerce found that a steel producer's high price was attributable to the company being

"a specialty steel producer of niche products." *Stainless Steel*, 75 Fed. Reg. 6,631

(accompanying Issues & Dec. Mem. at 6). Therefore, the Department asserts that it could not

use Customs data to analyze this producer's prices "because the [HTSUS] category includes a

general 'basket' of stainless steel sheet and strip products that do not reflect the characteristics of

[the niche producer's] product or industry." *Stainless Steel*, 75 Fed. Reg. 6,631 (accompanying

Issues & Dec. Mem. at 6).

Similarly, in *Furniture*, the Department found that it could not use Customs data because

variations among different types of furniture greatly influenced pricing: "'[p]hysical

characteristics not shared by the same types of furniture (*e.g.*, primary material or type of wood)

could greatly affect the unit price and such price variations could be responsible for the price

differences we observed. Therefore, the Department has not found that these price differences

necessarily indicate that the sales are not *bona fide*.'" Bona Fides Mem. at 8 (quoting *Furniture*,

75 Fed. Reg. 9,581 (accompanying Final Bona Fides Mem. at 4)). Here, defendant argues,

Commerce found that none of these issues were present, and that Chengda has failed to provide

any reason to expect price variations within the tariff heading at issue—peeled garlic—sufficient

to require an analysis similar to that used in *Fish Fillets*, *Stainless Steel*, and *Furniture*. Def.'s

Mem. 11.

Although claiming that its merchandise is unique, plaintiff offers *no reason* why it was so

different as to make a comparison with the Customs data for other entries of peeled garlic

inappropriate. Indeed, Chengda does not claim that the Customs data is for a basket tariff

category, nor has plaintiff cited to any record evidence showing why its product is complicated

or unique. Had plaintiff provided evidence that its entry of fresh peeled garlic differed to such an

extent from the other merchandise entered under the same tariff heading that a comparison with

the Customs data would be inaccurate, the analysis found in the reviews it cites may have been

appropriate.  Plaintiff, however, has not provided any indication that this is the case here.  For

these reasons, the court finds plaintiff's arguments unavailing.

### 5.  *Comparison of Sales Prices at Different Levels of Trade*

Chengda next argues that Commerce unreasonably compared price data at two distinct

levels of trade.  The Customs import data used by Commerce contains prices for arm's-length

sales between PRC exporters and unaffiliated U.S. importers.  Chengda notes that the entered

value of its peeled garlic was an internal transfer price between itself and its affiliated importer,

not an arm's-length transaction.  Thus, plaintiff argues that this internal transfer price is neither

an "export price" nor a "constructed export price" as defined by 19 U.S.C. § 1677a.  Pl.'s Br. 23.

For plaintiff, this means that the sales price to Chengda's affiliate should be disregarded for

purposes of Commerce's analysis because comparing the internal transfer price to the Customs

data fails to make a fair (apples-to-apples) comparison.  Pl.'s Br. 22–23.

Plaintiff also objects to the comparison of the Customs data to the CEP sales made by

Chengda's affiliate to the retailers.  Plaintiff asserts that the Customs pricing data excludes

domestic transportation and other costs, while these expenses were included in the sales prices

from Chengda's affiliate to the retail stores.  Pl.'s Br. 25.  Chengda thus argues that a comparison

between the sales prices to the three retailers (the CEP prices) and the prices in the Customs data

is also unreasonable because the prices in the Customs data are not for products that incurred the

additional expenses involved in transferring the goods to retailers.

Defendant counters that the focus of Commerce's price analysis was, in fact, the three

sales made by the affiliated importer to the three unaffiliated retail stores, and that Commerce

only considered Chengda's transfer price in its analysis because it found the comparison to be

useful in determining whether the subsequent retail sales were indicative of future commercial

behavior.  Bona Fides Mem. at 4 n.18.  That is, the Department looked at whether Chengda sold

its garlic to its affiliate at an unusually high price in order to justify its high sales prices to the

retailers.  Commerce maintains, however, that its determination that Chengda's sales prices were

unusually high was based primarily on its analysis of the CEP sales to the three retailers.  Bona

Fides Mem. at 4 n.18 ("As the sales [to the three retailers] have been reported as CEP sales, the

actual sales price for the sales under review is [the price paid by the three retailers].").

       As to its analysis of the sale to Chengda's affiliate, Commerce notes that it generally

prefers not to use comparisons involving internal transfer prices because of the limited

information available on the record for those types of transactions.  Here, however, the

Department found the analysis of the transfer sale to be useful.  Bona Fides Mem. at 3

(Chengda's "one shipment was to Chengda's affiliated importer and customer . . . , who, in-turn,

sold the garlic to three unaffiliated U.S. customers.  In performing a *bona fide* analysis, the

Department will typically evaluate the first unaffiliated transaction, in this instance, [the

affiliated importer's] sales to the [three retail] U.S. customers.  Where possible, the Department

prefers not to use comparisons that involve transfer prices.  Based on the limited information on

the record, however, and the lack of reasonable alternatives provided by Chengda . . . , the

Department finds that an analysis of Chengda's transfer price transaction to [its affiliated

importer] is useful in evaluating the nature of Chengda's CEP sales [to the three retailers].

Therefore, for purposes of this new shipper, the Department is reviewing both the transfer sale

and the three CEP sales as part of the *bona fides* analysis.").

Put another way, Commerce claims that its analysis of the transfer price was made in tandem with its analysis of the three CEP sales,[8] and that, while the Department's focus was on the three CEP sales, its purpose for analyzing the transfer price was to assist with its analysis of whether the three CEP sales were bona fide.  Def.'s Mem. 24 ("Commerce analyzed Chengda's transfer price to its importer because it was 'useful in evaluating the nature of Che[ng]da's CEP sales,' *i.e.*, in determining whether the CEP sales prices were aberrational or non-bona fide."); Bona Fides Mem. at 1 n.2 ("[W]e also examine[d] certain aspects of the single shipment to the affiliated importer, as its terms inform our conclusions regarding the three resales.").

Further, defendant disputes plaintiff's argument that Commerce should not have compared Chengda's three CEP sales to the Customs import data because these three sales were made at a different level of trade from the sales found in the Customs data.  In particular, based on its calculations, defendant points out that "Commerce explained that movement expenses [(i.e., the freight, duties, and packaging)] incurred by Chengda's affiliated importer did not contribute to the difference between its price and the AUV."[9]  Def.'s Mem. 25 (citing Bona Fides Mem. at 13–14).  To support this assertion, the Department examined information submitted by Chengda which specified the expenses that were incurred by the company's U.S. affiliate in

---

[8]        It should be noted that had Commerce limited its analysis to the three CEP sales, as urged by plaintiff, these sales would still have been found to be aberrational because the CEP sales price of [[         ]] far exceeds the AUV for peeled garlic of [[         ]], even when costs incurred in transferring the product to the retailers are factored out.  Bona Fides Mem. at 4.

[9]        Specifically, Commerce determined that "even if the unaffiliated customers had been responsible for all freight and duties, the price they would have paid . . . would only be [[         ]] per kg, [[         ]] less than what they paid [Chengda's U.S. affiliate]."  Bona Fides Mem. at 15.

making the three sales to the unaffiliated retailers.[10]  Bona Fides Mem. at 13.  Upon reviewing

this information, Commerce found that "[a]dding these figures for packaging and movement

expenses to the [Customs] AUV results in a figure . . . [which is] still far below [Chengda's sales

prices]."  Bona Fides Mem. at 14.  In fact, Commerce found that when it accounted for moving

and packaging expenses, "[e]ither [of Chengda's sales prices] would still be higher than any

entry of any peeled garlic in the [Customs] data."  Bona Fides Mem. at 14.  "Therefore, the

Department [found] that when considering every conceivable reason for differences in price (and

giving Chengda the benefit of the doubt in all situations), Chengda's price, whether viewed at the

transfer price or CEP level, still indicates that the sale was *not* bona fide."  Bona Fides Mem. at

14.

 This Court has consistently held that Commerce must fairly compare "values at a

'common point in the chain of commerce' so as to achieve a fair 'apples-to-apples' comparison."

*See Fla. Citrus Mut. v. United States*, 31 CIT 1461, 1468–1469, 515 F. Supp. 2d 1324, 1332

(2007) (citations omitted); *see also Am. Permac, Inc. v. United States,* 16 CIT 41, 42, 783 F.

Supp. 1421, 1423 (1992) ("Fair (apples to apples) comparison is the goal of the price

---

 [10] Based on information submitted by Chengda, Commerce calculated the packaging
and moving expenses incurred by Chengda's U.S. affiliate.  The Department then found that

> [a]dding these figures for packaging and movement expenses to the [Customs]
> AUV results in a figure of [[  ]] per kg, still far below the price from
> Chengda to [its U.S. affiliate] of [[  ]] and the CEP price from [the U.S.
> affiliate] to the three unaffiliated customer[s] of [[  ]] per kg.  Either price
> would still be higher than any entry of any peeled garlic in the [Customs] data.
> The lower price—the price between Chengda and [its U.S. affiliate] of
> [[  ]]—would still be [[   ]] than the next closest peeled garlic
> entry, and it would be [[    ]] than the AUV for all peeled garlic
> entries.

Bona Fides Mem. at 14.

comparisons required by the antidumping laws, as the courts have stated time and again.")
(citations omitted).

Under the Department's normal practice, it focuses the bona fide analysis on the first
arm's-length transaction to an unaffiliated customer, i.e., the CEP sale.  While Chengda's first
U.S. sale was to an affiliated importer, the second CEP sales were made by the affiliated
importer to three unaffiliated retailers.  Hence, as plaintiff notes, Chengda's first sale was not an
arm's-length transaction and, therefore, was not comparable to the arm's-length transactions in
the Customs import data.  The second sales, however, were arm's-length transactions, and thus
comparable.  Plaintiff insists, however, that these arm's-length transactions were made at a
different level of trade than those in the Customs data because they included additional expenses
necessary for the completion of these sales, and thus Commerce's comparison was invalid.

It is clear, however, that Commerce accounted for plaintiff's noted differences and made
a fair comparison (i.e., at the same level of trade) by taking into account the costs associated with
Chengda's CEP sales.  Bona Fides Mem. at 15.  That is, the Department took the amounts
supplied by plaintiff for the expenses incurred by its U.S. affiliate in making the three sales to the
retailers and subtracted these costs from the sales price from the U.S. affiliate to the three
retailers.  It then compared this adjusted price (i.e., the CEP sales price minus the costs involved
in packaging and moving the merchandise to the retailers) to the AUV in the Customs data and

found that the CEP sales prices were still abnormally high.[11]  Therefore, based on this

comparison, Commerce determined that the expenses incurred by Chengda's affiliate in making

the CEP sales failed to account for the disparity between the CEP sales prices and the AUV in

the Customs data.  Def.'s Mem. 25 ("Commerce explained that movement expenses incurred by

Chengda's affiliated importer did not contribute to the difference between its price and the

AUV.").  In other words, Commerce took the added downstream expenses into account when

reaching its conclusion that the first arm's-length sales of Chengda's product were aberrant,

thereby making the comparison at the same level of trade.  Indeed, an examination of the record

confirms that even if the added expenses are backed out, the retail-level sales prices deviated

greatly from the AUV.  Thus, it is apparent that, even taking into account the expenses Chengda

cites as contributing to the high price of the downstream CEP sales, the sales prices to the

unaffiliated purchasers were still unusually high.

     Further, as has been noted, Commerce analyzed Chengda's internal transfer sale to its

affiliated importer solely because it thought such an analysis might yield useful information

about the three CEP sales prices.  Def.s' Mem. 24 ("Commerce analyzed Chengda's transfer

price to its importer because it was 'useful in evaluating the nature of Che[ng]da's CEP sales,'

*i.e.*, in determining whether the CEP sales prices were aberrational or non-*bona fide*.");  Bona

---

[11]     According to Commerce,

     Record evidence indicated that [Chengda's affiliated importer] paid only [[
     ]] per kilogram for movement costs.  Commerce also determined that 'even if the
     unaffiliated customers had been responsible for all freight and duties, the price
     they would have paid would only be [[          ]] per kilogram, [[         ]] less
     than what they paid [ the affiliated importer ].'  Thus, Commerce reasonably
     determined that the inclusion of freight and customs duties in the CEP price does
     not explain the large difference between that price and the [Customs] AUV.

Def.'s Mem. 25 (quoting Bona Fides Mem. at 15).

Fides Mem. at 1 n.2 ("While the objective of this analysis is to determine the bona fide nature of the sales to the unaffiliated customers (i.e., the CEP sales), because those are the sales that would be used to determine the rate of dumping, [Commerce] also examine[d] certain aspects of the single shipment to the affiliated importer, as its terms inform[ed] our conclusions regarding the three resales.").

Here, it is undisputed that Chengda's internal transfer price to its affiliate was high when compared to the rest of the Customs dataset.  In fact, it was the highest entered value in the Customs data for peeled garlic, even though it was an internal transfer transaction.[12]  Thus, Commerce was reasonable in its conclusion that realizing a profit over the transfer price on the sales to the three unaffiliated retailers did not provide a justification for the unusually high prices in these later sales to the retailers.

Finally, it is worth noting that Chengda did not provide a reasonable alternative to this comparison.  Rather, it challenged the comparison to the Customs data of both its internal transfer price and its CEP prices, even with moving and packing costs backed out.  Plaintiff's only suggested alternative was that its three CEP sales could be compared to one another, but provided no additional suggestions or additional record evidence to support other possible methods for Commerce's analysis.

Therefore, (1) the analysis of these later CEP sales was a fair apples-to-apples comparison, and (2) the analysis of the transfer sales price revealed that Chengda could not use its desire to sell at a profit to justify the high prices found in the CEP sales.  Thus, Commerce has supported with substantial evidence its conclusion that Chengda's sales prices were unusually high.

---

[12]        Chengda's internal transfer price of [[                ]] to its affiliated importer was the highest entered value in the Customs data.

### 6.  *Market Pricing Considerations*

Plaintiff further argues that Chengda made its pricing decisions for the three CEP sales based on normal commercial considerations,[13] and that Commerce erred in purportedly finding that it was commercially unreasonable for Chengda's sales prices to the unaffiliated purchasers to have been so much higher than its internal transfer price.  Pl.'s Br. 27 ("[T]he Department's conclusion that no reasonable customer 'would be willing to pay that price' is not only not based on substantial evidence on the record, but rather 180 degrees opposite of the record evidence.").  In objecting to this claimed finding, plaintiff argues that "Commerce implicitly is stating that only if the U.S. importer sells at a loss that it is a *bona fide* sale."  Pl.'s Br. 26.  Finally, plaintiff contends that there is no evidence on the record that suggests that the retail purchasers were not "reasonable" customers, and challenges the Department's assertion that reasonable customers would not pay Chengda's prices.  Pl.'s Br. 26.

In the Rescission, Commerce found that both the internal transfer price and the CEP prices were unusually high.  Commerce maintains that these findings provided substantial evidence for its determination "that Chengda's sales were unreasonable, as well as atypical of both the garlic industry and Chengda's normal business practice and not predicative of likely future commercial activity."  Def.'s Mem. 18–19.  In particular, when the Department examined the internal transfer price and the three CEP sales, it "found that the prices at issue were aberrational because Chengda's transfer sales price was in fact 'the highest entered value for peeled garlic' during the [POR] and that the CEP sales price was 'yet even higher.'"  Def.'s Mem. 10.  Therefore, Commerce does not believe it was "punish[ing] Chengda for attempting to

---

[13]        In other words, plaintiff claims that Commerce is punishing Chengda for making "too much profit" on the CEP sales and that Commerce determined, without justification, that the resale price of [[        ]] to the retail stores was too high and, therefore, not commercially reasonable.  Pl.'s Br. 28.

make a profit consistent with principles of capitalism" but, rather, the Department was

identifying suspicious sales circumstances in order to add weight to its non-bona fide sales

analysis based on suspect pricing.  Def.'s Mem. 31.

Plaintiff is correct, of course, that reselling the subject merchandise at a profit is a normal

commercial practice.  However, "a profit on resale cannot establish the *bona fides* of the sale

where there is other evidence suggesting that the sale is not *bona fide."  Tianjin Tiancheng,* 29

CIT at 267, 366 F. Supp. 2d at 1257.  Further, "the existence of a profit does not provide

significant evidence of whether the sale price is typical for the market as a whole, or for

Plaintiff's future practice in particular." *Id.*  Here, Commerce concluded that because it found

the internal transfer price to be abnormally high, this price could not provide the basis from

which to measure profit and thus be used as a justification for the unusually high CEP sales

prices to the unaffiliated retailers.  In other words, as part of its totality of the circumstances

analysis, Commerce concluded that plaintiff could not point to its high internal transfer price,

and its desire to show a profit, to justify its high price for the later sales to the unaffiliated

purchasers.  As has been seen, because substantial evidence supports the Department's findings

that plaintiff's internal sales price was unusually high, Commerce did not err in its conclusion

that the requirement to make a profit did not justify the high prices to the retailers.

Next, plaintiff argues that Commerce erred in comparing Chengda's sales to the

unaffiliated customers to a sale it made in a third country because the U.S. and the third country

are different markets with different market factors.[14]  Pl.'s Br. 29.  During the investigation,

"[b]ased on the Department's request, Chengda provided sales documentation for domestic and

---

[14]        Specifically, plaintiff argues that Commerce erred in comparing Chengda's U.S. sale to its sale made to [[          ]], since the U.S. and [[          ]] are different markets with different market factors.  Pl.'s Br. 29.

third country sales during the POR." Bona Fides Mem. at 14. Commerce compared these sales,

and found that "[a]ccording to the commercial invoice, Chengda's unaffiliated [third country]

sales price was . . . [much lower than] the price to the unaffiliated U.S. customers."[15] Bona Fides

Mem. at 14. For the Department, this evidence indicated that Chengda's CEP "sales price . . .

appear[ed] to be atypical of Chengda's price of subject merchandise to its other customers during

the POR." Bona Fides Mem. at 14. In addressing plaintiff's argument, defendant points out that,

while plaintiff claims that the third country is a different market with different market factors,

"Chengda does not explain what those factors are or how they would affect the price analysis,

and there is no record evidence that provides any information to this effect." Def.'s Mem. 31.

       With respect to Commerce's methodology, this Court has often affirmed the procedure of

considering a plaintiff's third-country sales as one part of its bona fide analysis. *See, e.g.,*

*Shandong Chenhe*, 34 CIT at __, Slip Op. 10-129, at 17–18; *Hebei New Donghua*, 29 CIT at

615, 374 F. Supp. 2d at 1343; *Tianjin Tiancheng,* 29 CIT at 269, 366 F. Supp. 2d at 1258

("[T]hird-country sales were relevant to the determination and demonstrated that Plaintiff had

priced the product in a manner more reflective of the AUV data during the POR.").

       As to the facts presented here, it is apparent that Commerce compared the third country

sale only to Chengda's CEP sales to the unaffiliated purchasers, which plaintiff insists were

market-price sales. Thus, the comparison was valid on its face. Moreover, plaintiff has

produced no evidence that its third country sale was not at a market price, or that some special

condition made a comparison to this sale improper. Rather, plaintiff questions the use of the

---

[15]        "Based on the Department's request, Chengda provided sales documentation for
domestic and third country sales during the POR. This included documentation for a sale of
[[                                    ]]. According to the commercial invoice, Chengda's unaffiliated
[[          ]] sales price was [[          ]] per ton, or [[          ]] per kg, [[                    ]] the
price to the unaffiliated U.S. customers." Bona Fides Mem. at 14.

third country sale without presenting any evidence that specific market factors made the comparison invalid.  Thus, it was reasonable for Commerce to consider Chengda's third-country sales as part of its analysis.

Finally, as an alternative to Commerce's use of the Customs import data for purposes of comparison, plaintiff suggests that Commerce should have compared Chengda's three CEP sales to each other.  Relying on an earlier case in this Court where Commerce rescinded a new shipper review after finding that a sale was not bona fide, plaintiff contends that "when an exporter has multiple sales to the U.S., Commerce has compared the prices of these sales to each other to determine whether they are *bona fide* and indicative of future sales."  Pl.'s Br. 16 (citing *Windmill Int'l Pte., Ltd. v. United States*, 26 CIT 221, 193 F. Supp. 2d 1303 (2002)).  Plaintiff believes that had Commerce compared the three sales between Chengda's affiliated importer and the three retailers to one another, it would have found that their similarities in product, pricing, and quantity would have indicated that the sales were commercially reasonable.

In response, defendant distinguishes *Windmill* from the facts presented here.  According to the Department, in *Windmill*, Commerce "was putting the subject sale within the context of [Windmill's] normal established business relationship with its customer."  Def.'s Mem. 26. Specifically, in *Windmill*, as one part of its analysis leading to the conclusion that Windmill's sale was not commercially reasonable, "Commerce maintain[ed] that the sale between Windmill and [its] United States purchaser was atypical [because] . . . six months prior to and subsequent to the sale [under review], Windmill made sales of different merchandise to the same U.S. purchaser in quantities that were substantially larger than the test sale quantity."  *Windmill*, 26 CIT at 229, 193 F. Supp. 2d. at 1311.  Further, "[d]uring the POR, Commerce 'review[ed] the totality of the circumstances surround[ing] [Windmill's] sale' (that is, *inter alia*, . . . whether the

sale was typical of Windmill's and the United States purchaser's normal business practices) to

determine whether Windmill's sale was commercially unreasonable and, therefore, not bona fide.

Commerce applied its commercial reasonableness methodology and determined that Windmill's

sale to the United States purchaser was a non-bona fide sale." *Windmill*, 26 CIT at 231, 193 F.

Supp. 2d at 1313 (citations omitted).

Here, the Department could not replicate its *Windmill* comparison because, as a new

exporter, Chengda did not have a history of sales into the U.S. from which a pattern could be

discerned, nor did it ship any other product to the U.S. that would tend to establish a pattern.

Def.'s Mem. 26 ("In this case, in contrast to *Windmill*, Chengda did not have an established

business practice in the American garlic market or with the three unaffiliated customers, such

that any price comparison could be put in the context of that practice."). Thus, Commerce

maintains that in *Windmill* it was appropriate to compare the respondent's sales before and after

the POR to determine whether the sale at issue deviated from the respondent's normal business

practices, but that a similar comparison was not possible here because Chengda had no previous

U.S. sales.

Further, defendant states that Commerce did in fact compare Chengda's three CEP sales

in relationship to one another, but "this time determined that their *similarities* were suspicious

and did not indicate normal commercial business practices." Def.'s Mem. 26. In particular,

when "Commerce considered [Chengda's] three CEP sales in relation[] to one another" the

Department found they were suspicious because "Chengda's CEP sales to three unaffiliated

customers were made for the same price on the same day."[16]  Def.'s Mem. 26.

The court finds that Commerce reasonably determined that the practice found in *Windmill* was inapplicable here because Chengda had no history of sales into the U.S. market that could be examined to determine the company's regular business practices.  Further, upon consideration of the relationship between Chengda's CEP sales, it was reasonable for the Department to consider the three sales unlikely to be indicative of future business activity since they were on nearly identical terms.  That is, the sales were made to the three retailers for the same unusually high price on the same day for essentially the same quantities.  Commerce can hardly be faulted for finding these terms to be suspicious and to doubt that these sales would be repeated.

In sum, the court finds Commerce's determination that Chengda's sales prices were unusually high, and therefore indicative of a non-bona fide sale, was supported by substantial record evidence and was in accordance with law, based on the Department's reasonable findings that: (1) Chengda's objection to the use of the Customs data because the AUV was not known to the company until after the POR was without merit; (2) the company failed to provide any evidence, beyond mere speculation, that the Customs data contained errors and was not representative; (3) the AUV in the Customs data was a useful tool for determining whether Chengda's sales prices were aberrational and that even had Commerce used a "range of values" analysis, the company's sales prices would still have been outside the norm; (4) plaintiff offered

---

[16]      Indeed, in the Bona Fides Memorandum, the Department reported that Chengda's U.S. affiliate "sold the peeled garlic shipment from Chengda to three reportedly unaffiliated customers on the same day ([[                    ]]) and at the same price ([[                    ]])." Bona Fides Mem. at 4.  Commerce further found "the following facts regarding the reported sales to the three unaffiliated customers to indicate that these prices do not represent normal commercial practices [because] [t]hese customers agreed to purchase garlic on the same day, and the day of the purchase was [[                    ]].  In addition, all three of the unaffiliated customers agreed to pay the same inexplicably high [[                    ]] price."  Bona Fides Mem. at 4.

*no reason* why its product was so different as to make a comparison with the Customs data for other entries of peeled garlic inappropriate; (5) Commerce accounted for plaintiff's noted differences between its CEP sales and the sales in the Customs data and made a fair comparison (i.e., at the same level of trade) by taking into account the costs associated with Chengda's CEP sales; (6) Commerce analyzed Chengda's internal transfer sale to its affiliate because it thought such an analysis might yield useful information about the three CEP sales prices, and was not relying on a comparison of prices at different levels of trade; (7) plaintiff could not point to its high internal transfer price, and its desire to show a profit, to justify its high price for the later sales to the unaffiliated purchasers; (8) it was reasonable for Commerce to consider Chengda's third-country sales as part of its analysis; and (9) the analysis in *Windmill* was inapplicable here because Chengda had no history of sales into the U.S. market that could be examined to determine the company's regular business practices.

## B.  Commerce's Determination That Chengda's Sales Quantity Was Low Was Supported by Substantial Record Evidence

In the Rescission, Commerce found that Chengda's sales quantity[17] to its affiliated importer was sufficiently low as to indicate a non-bona fide sale.  In opposing this finding, Chengda argues that its sales quantity was indicative of a bona fide sale because its shipment was within the range of volumes of peeled garlic entered during the POR, and that there were shipments with quantities in line with Chengda's.[18]  Pl.'s Br. 30.  Plaintiff believes that the

---

[17]      The quantity of Chengda's sale to its affiliated importer was [[        ]] kilograms, while the average quantity in the Customs data was [[           ]] kilograms.  Bona Fides Mem. at 5.

[18]      Specifically, of the combined total of [[           ]] entries of garlic during the POR (i.e., the [[        ]] entries of peeled garlic plus the [[        ]] entries of whole garlic), there were [[      ]] shipments with quantities [[        ]] than Chengda's.  Pl.'s Br. 30.

presence of similarly-shipped quantities indicates that its shipment was commercially reasonable. Pl.'s Br. 30 ("Chengda did not ship the lowest quantity, but shipped within the range of all shipments of . . . garlic reported by [Customs].  Indeed, these other [lower-quantity] shipments were made by numerous exporters that Commerce has found in prior reviews to be selling at *bona fide* prices and quantities and for whom the Department had calculated company-specific dumping margins.").

Plaintiff also claims that Commerce failed to acknowledge that Chengda shipped its garlic in a 20-foot container that "was full of garlic and nothing else," citing this as another indication that Chengda's shipment was commercially reasonable.  Pl.'s Br. 30–31 ("It is obvious that Chengda shipped garlic in a 20-foot container.  It is stated on the bill of lading. That is why the total weight was less than Commerce expected.  With millions of 20-foot containers used around the world annually, is Commerce arguing that no sale shipped in a 20-foot container is *bona fide*?").  In the alternative, while maintaining that Chengda shipped a full 20-foot container of garlic, plaintiff also asserts that there may be commercial reasons for not shipping a full container, as "an exporter may choose to fill each carton with less garlic, so that the cartons placed on the bottom of the container will not be crushed, resulting in a lower quantity shipped."  Pl.'s Br. 31.

In addition, plaintiff asserts that it was "inappropriate to compare the quantities sold by Chengda's related importer to the retail grocery stores to the [Customs] data because they were made at a level of trade different from that reported in the [Customs] data."  Pl.'s Br. 31. Plaintiff also argues that the similar quantities purchased by each of the retail stores indicate that Chengda's sales were commercially reasonable.  Pl.'s Br. 33.

Defendant responds that Commerce did compare the quantity Chengda shipped to its affiliate to the average quantity in the Customs data and found that Chengda's quantity was unusually low.[19]  Def.'s Mem. 32.  Furthermore, defendant argues that comparing Chengda's quantity to the average quantity in the Customs data is superior to comparing it to a range of quantities because a larger sample size is a better indicator of normal business activity.  Def.'s Mem. 33 ("In accordance with its longstanding practice and the Court's guidance in [*Shandong*] *Chenhe* and *Tianjin Tiancheng*, in comparing the quantity—just as with the price—Commerce used the average quantity, because the larger sample is a better indicator of normal activity than a small number of selected sales.").

Defendant also points out that Commerce considered whether Chengda shipped a full 20-foot container and found that it had not because the company's shipped quantity was far less than the capacity of a 20-foot container.[20]  Def.'s Mem. 35.  Furthermore, defendant rejects plaintiff's argument that the commercial reasons for not shipping a full container (i.e., to keep the garlic from being crushed) because the argument is "based purely upon speculation and hypotheticals without support from record evidence, and [Chengda] does not tie this assertion to its own choice of shipping method."  Def.'s Mem. 35.

Plaintiff does not dispute Commerce's finding that, when compared to average quantity in the Customs data, Chengda's quantity upon importation was unusually low.  Indeed, plaintiff

---

[19]     Indeed, Commerce found that "Chengda's entry quantity, amounting to less than [[          ]] of the average exported quantity, was unusually low—making it the [[          ]] quantity out of [[                    ]] entries and ranking in the bottom [[       ]] percentile and more than [[     ]] percent below the average."  Def.'s Mem. 33.  Furthermore, defendant notes that "by Che[ng]da's own admission, only [[        ]] percent of the peeled garlic entries had quantities within [[     ]] percent of Chengda's quantity."  Def.'s Mem. 34.

[20]     Commerce determined that Chengda's shipment of [[           ]] kilograms could not have filled a full 20-foot container, which typically holds 20,000 kilograms of garlic.  Def.'s Mem. 35.

acknowledges that its shipment was one of the smallest entries during the POR in terms of quantity.  Pl.'s Br. 30.  Furthermore, plaintiff does not dispute Commerce's use of the Customs data to analyze Chengda's quantity as it did with Commerce's price analysis.

The court finds that Commerce appropriately compared the quantity of Chengda's sale to its U.S. affiliate to the average quantity in the Customs data since "using the average of a large sample is a better indicator of normal activity than a comparison of a smaller number of selected sales."  *Shandong Chenhe,* 34 CIT at __, Slip Op. 10-129, at 17.  Further, comparing a respondent's shipment quantity to the average quantity of like-product entered during the POR is a useful tool when determining if a transaction is commercially reasonable.  *Hebei New Donghua*, 29 CIT at 610, 374 F. Supp. 2d at 1339 ("In evaluating whether or not a sale is 'commercially reasonable,' Commerce [can] consider[] the . . . price and quantity [of the transaction].");  *see also Tianjin Tiancheng,* 29 CIT at 260, 366 F. Supp. 2d at 1250 ("[A]ny factor which indicates that the sale under consideration is not likely to be typical of those which the producer will make in the future is relevant.").

Moreover, comparing the quantity of plaintiff's shipment to the range of quantities in the Customs data, while also a useful tool, would not aid plaintiff since nearly all of these entries during the POR were of a much greater quantity than Chengda's.  Had Commerce chosen to use a range of import quantity values as part of its analysis, it would have found that plaintiff's entry was very much an outlier, and among the smallest quantities listed among the many entries of peeled garlic for the POR.  Thus, Commerce's finding that the amount of garlic shipped by Chengda was unusually low, based on a comparison to the average quantity in the Customs data, was reasonable and supported by substantial evidence.  Therefore, the court is not persuaded by Chengda's arguments relating to the relative size of its entry.

In reaching its conclusion, the court acknowledges that "the size of an entry does not necessarily control Commerce's analysis.  Nonetheless, the size of the sale can raise questions as to whether the purchaser would buy the merchandise in the future in the same quantity at the same price."  *Shandong Chenhe*, 34 CIT at __, Slip Op. 10-129, at 14 (citations omitted); *see also Tianjin Tiancheng,* 29 CIT at 260, 366 F. Supp. 2d at 1250 ("[B]ecause the ultimate goal of the new shipper review is to ensure that the U.S. price side of the antidumping calculation is based on a realistic figure, any factor which indicates that the sale under consideration is not likely to be typical of those which the producer will make in the future is relevant.").  Thus, the size of the entry can play a role in the "totality of the circumstances" analysis.

In addition, Chengda's argument regarding its shipment of a "full container" is entirely unavailing because it is clear from the record that the quantity of garlic it shipped would not have filled an entire 20-foot container.  Bona Fides Mem. at 16 ("[E]vidence on the record indicates that [Chengda's] low quantity shipment was not close to a full container, typically over 20 metric tons depending on the density of the packing, even after considering that some portion of the container would be taken up by packing materials.").  Furthermore, plaintiff's suggestions as to why an exporter may choose not to ship a full container (e.g., to prevent garlic from being crushed) were not supported by any evidence on the record, and there is no indication that Chengda's shipped quantity was influenced by any of these considerations.

As to plaintiff's argument that it was unreasonable for Commerce to compare the quantities of the three sales to the unaffiliated retailers to the average entered quantity during the POR in the Customs data, it is clear that Commerce did not make this comparison.  Rather, Commerce compared Chengda's full sales quantity to its affiliate to the average quantity in the Customs data.  Def.'s Mem. 32 ("Commerce reasonably compared Chengda's entry quantity to

the average quantity of all other entries of peeled garlic during the [POR] contained in the

[Customs] Data.").  Further, as discussed above, plaintiff's contention that the similar quantities

of its three CEP sales, when compared to one another, should indicate that these quantities were

commercially reasonable is unpersuasive because the similar quantities of these three sales,

combined with the timing and identical pricing of the sales, were cause for suspicion, not indicia

of commercially-reasonable sales.

The court concludes that Commerce's determination that Chengda's quantity was

unusually low and not indicative of future sales was reasonable and based on substantial record

evidence because: (1) it was appropriate for Commerce to compare Chengda's quantity to the

average quantity in the Customs data since the average was a good indicator of normal business

activity; (2) comparing the quantity of plaintiff's shipment to the range of quantities in the

Customs data would not aid plaintiff since nearly all of these entries during the POR were of a

much greater quantity than Chengda's; (3) Chengda's argument that it shipped a full container is

entirely without basis; (4) plaintiff's suggestions as to why an exporter may choose not to ship a

full container were not supported by any evidence on the record and there is no indication that

Chengda's shipped quantity was influenced by any of these considerations; (5) plaintiff's

argument that it was unreasonable for Commerce to compare the quantities of its three CEP sales

to the average entered quantity in the Customs data was unfounded because Commerce did not

make this comparison; and (6) Commerce reasonably found unpersuasive plaintiff's suggestion

that the nearly-identical quantities of Chengda's three CEP sales should have indicated that these

quantities were commercially reasonable because the similar quantities of these three sales were

cause for suspicion.

### C. *Commerce's Conclusions Regarding the Timing of Chengda's Sales Were Supported by Substantial Evidence*

Finally, plaintiff challenges Commerce's finding that the close timing of Chengda's purchase of shares in a U.S. importer, the company's subsequent sale of garlic to that affiliated importer, and the affiliate's immediate three sales to the unaffiliated retailers, were cause for rescinding Chengda's new shipper review.  Pl.'s Br. 34; *see* Def.'s Mem 37–38 (quoting Bona Fides Mem. at 17) ("Commerce's determination that the structure of Chengda's sales [was] not indicative of typical business practices and future commercial behavior is also supported by substantial evidence and is otherwise in accordance with law. . . . [T]he close timing between all these events[21] . . . indicates 'that the sale was not made under normal commercial considerations.'").

Chengda asserts that it could only make sales to the U.S. after it purchased shares in the U.S. importer, and that there is nothing unusual about purchasing a company and using it immediately, nor was making three sales in one day commercially unreasonable.  Pl.'s Br. 35. Plaintiff maintains that "Commerce cites no statutory or regulatory authority for its contention that the Department can go beyond the boundaries of the U.S. sale to determine whether the sales themselves are *bona fide*."  Pl.'s Br. 35.  In other words, plaintiff believes Commerce is limited to analyzing the sale at issue, such as price and quantity factors, and may not consider the general circumstances surrounding the sale.

---

21      In terms of the suspicious timing, Commerce found that "[n]ot only did Chengda enter into a sales agreement with its affiliated importer on [[                                     ]], which was within [[             ]] of purchasing a [[       ]] percent stake in the company, but on [[         ]] its [[                               ]]-acquired affiliate also made three sales to unaffiliated parties, all at the same price and [[                                                                 ]]."  Def.'s Mem. 37 (citations omitted).

Defendant responds that the totality of the circumstances surrounding Chengda's sale—the close timing of Chengda's purchase of shares in the U.S. importer, Chengda's quick sale to its newly-acquired importer, and the importer's nearly simultaneous CEP sales to the three retailers on materially identical terms—indicate that the sales were not predicative of future business practices.  Def.'s Mem. 37–38.  Instead, "the transactions appeared to Commerce to reflect a singular set of sales that Chengda was unlikely to repeat."  Def.'s Mem. 38.  Defendant maintains that Chengda's purchase of shares in the U.S. importer was relevant to its analysis since the company itself acknowledged that the purchase of shares provided the vehicle for Chengda's sale into the United States.  Def.'s Mem. 39 ("Chengda . . . admits to using its importer as its means to make sales to the United States.  It was therefore reasonable for Commerce to interpret the record evidence and determine that the timing of Chengda's purchase of shares in its importer, and the importer's subsequent sales for the same price on the same day, indicated that Chengda's sales were not indicative of its future sales and pricing behavior.  Although Commerce 'did not make [its] timing concerns the focus of [its] analysis,' the . . . series of events further indicated to Commerce that the CEP sales were not made under normal commercial considerations." (quoting Bona Fides Mem. at 18 n.80)).

As has been the case with several of the factors that Commerce took into account in reaching its determination, were the purchase of the interest in the affiliate the sole portion of the entire transaction considered, it would not provide sufficient evidence that Chengda's sales were not commercially reasonable.  Put another way, the court does not believe that the Department has produced enough evidence for a finding that, standing alone, the timing of the purchase of the interest in the affiliate to facilitate sales to United States was suspect.

Commerce, however, has the authority to consider a variety of factors in determining whether a transaction is commercially reasonable. *See Hebei New Donghua*, 29 CIT at 616–17, 374 F. Supp. 2d at 1343–44 (sustaining Commerce's consideration of a customer's post-sale behavior); *Windmill*, 26 CIT at 231–32, 193 F. Supp. 2d at 1313–1314 (citation omitted). In order to prevent an exporter from unfairly benefitting from an atypical sale to obtain a low dumping margin, Commerce may review any relevant evidence that suggests that a U.S. sale was commercially unreasonable or atypical of future business practice. *See Tianjin Tiancheng*, 29 CIT at 260, 366 F. Supp. 2d at 1250. Therefore, the timing and circumstances surrounding Chengda's purchase of shares in the U.S. importer and the importer's subsequent sales, on their own, would not be sufficient to find the company's sales to be non-bona fide. When combined with the immediate sale of plaintiff's peeled garlic to three retailers on nearly identical terms one month before the garlic entered the United States, however, the purchase of the interest in the affiliate tends to support Commerce's conclusion that the transaction was atypical of normal business practices. Thus, the peculiar circumstances presented here could be considered by Commerce in its totality of the circumstances analysis, and it was not unreasonable for Commerce to find that the singular facts surrounding those sales would be unlikely to be repeated in the future.

## CONCLUSION

For all of these reasons, the court finds that Commerce has supported with substantial evidence its determination that, under "a totality of the circumstances" test, Chengda's sale was not "commercially reasonable" and was "atypical of normal business practices." *Shandong Chenhe*, 34 CIT at __, Slip Op. 10-129, at 6; 19 U.S.C. § 1516a(b)(1)(B)(i) (The court will uphold Commerce's determinations that are "supported by substantial evidence on the record"

and are "in accordance with law."). That is, (1) Commerce properly used the AUV from the

Customs data to determine that Chengda's sales prices were unusually high and these high prices

could not be accounted for by (a) errors in the Customs data, (b) the Department's failure to

compare Chengda's prices to the range of prices in the Customs data, rather than to the AUV, (c)

Chengda's product being unique and therefore incomparable to the Customs data, (d)

Commerce's failure to adjust for the different levels of trade represented by Chengda's internal

transfer price and CEP sales prices, (e) Chengda's profit-motive, or (f) the Department's failure

to compare the prices to one another, and (g) Commerce's improper comparison between

Chengda's CEP sales prices and its third country sales; (2) Commerce properly compared

Chengda's shipped quantity to the average of all shipped quantities in the Customs data and

found that the company's sales volume was unusually low, and this finding was not undermined

by Chengda's arguments (a) that Commerce failed to recognize that the quantity was within the

range of the other shipments, (b) that Chengda had shipped a full 20-foot container, which it had

not, (c) that there were reasonable commercial reasons for Chengda not to ship a full 20-foot

container, which there were not, (d) that Commerce incorrectly compared the quantities of

Chengda's three CEP sales to the average in the Customs data, which the Department did not, (e)

and that had Commerce compared the quantities of Chengda's three CEP sales to each other, it

would have found the sales commercially reasonable; and (3) Commerce properly found that the

circumstances surrounding Chengda's sales were not indicative of normal or future business

practices and were unlikely to be repeated. In light of these reasonable findings, Commerce's

Rescission of Chengda's new shipper review was supported by substantial evidence and was in

accordance with law.

Therefore, based on the foregoing, plaintiff's Motion for Judgment on the Agency Record is DENIED and the Department of Commerce's final determination rescinding plaintiff's new shipper review is SUSTAINED.


                                                    /s/ Richard K. Eaton
                                                    Richard K. Eaton

Dated: March 25, 2013
        New York, New York